


CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed April 12, 2022**

_____
**United States Bankruptcy Judge**

<br>

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No.: 21-30915-sgj7** |
| **MARIE FATOR SLIGH,** | § | **Chapter 7** |
|     Debtor. | § | |
| _____ | § | |
| | § | |
| **TERRY WAYNE FATOR,** | § | |
|     Plaintiff, | § | |
| | § | |
| v. | § | **Adversary No.: 21-03052-sgj** |
| | § | |
| **MARIE FATOR SLIGH,** | § | |
|     Defendant. | § | |
| _____ | § | |

## MEMORANDUM OPINION AND ORDER GRANTING PLAINTIFF'S MOTION
## FOR SUMMARY JUDGMENT [DE # 25]

This is the court's ruling, pursuant to Fed. R. Bankr. Proc. 7056, on the motion for summary

judgment filed by Terry W. Fator (the "Plaintiff") in the above-referenced adversary proceeding,

in which he has sued his mother, Marie Fator Sligh (the "Debtor"), seeking a declaration that a $51,603.90 debt he holds against her, based on a Nevada state court default judgment he obtained in the year 2017, should be declared nondischargeable pursuant to Section 523(a)(6) of the Bankruptcy Code.  The court heard oral argument on April 6, 2022.

## I.    INTRODUCTION

As stated, the Plaintiff in this Section 523(a)(6) action is the Chapter 7 Debtor's son—who happens to be a Las Vegas entertainer and celebrity who catapulted to fame and fortune several years ago after winning the "America's Got Talent" television show. The Plaintiff alleges that his mother, the Debtor, engaged in extortionate, defamatory, and other unlawful conduct, after he became famous, in an attempt to extract money from him.  He alleges that her activities created a debt that is nondischargeable, pursuant to section 523(a)(6).  The question before the court now, in this summary judgment context, is whether the undisputed summary judgment evidence establishes that there is no genuine issue of any material fact in dispute and—based thereon— whether Plaintiff is entitled to a nondischargeable debt as a matter of law.  The court has concluded after deliberation that this dispute should not be required to go to trial.  The undisputed summary evidence shows that Plaintiff is entitled to a nondischargeable debt against his mother as a matter of law.

## II.    JURISDICTION

Bankruptcy subject matter jurisdiction exists in this adversary proceeding pursuant to 28 U.S.C. § 1334.  This is a statutory core proceeding, pursuant to 28 U.S.C. §157(b)(2)(A), (B), (I), and (O); thus, the bankruptcy court has statutory authority to enter a final order.  Moreover, the court has determined that it has Constitutional authority to enter a final order in this matter, since

the parties in this matter have both consented to entry of a final order by this court.[1] Finally, venue

is proper before this court, pursuant to 28 U.S.C. §§ 1408 and 1409.

## III.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate whenever a movant establishes that the pleadings,

affidavits, and other evidence available to the court demonstrate that no genuine issue of material

fact exists, and the movant is, thus, entitled to judgment as a matter of law.[2] A genuine issue of

material fact is present when the evidence is such that a reasonable fact finder could return a verdict

for the non-movant.[3] Material issues are those that could affect the outcome of the action.[4] The

court must view all evidence in a light most favorable to the non-moving party, the Debtor, and

summary judgment is only appropriate where the non-movant "fails to make a showing sufficient

to establish the existence of an element essential to that party's case."[5]

## IV.   THE UNDISPUTED SUMMARY JUDGMENT EVIDENCE

The undisputed evidence was that the Plaintiff (son) and the Debtor (mother) were in an

unpleasant and fractured family situation for years before the Plaintiff became famous, and there

were periods of estrangement between the Plaintiff and the Debtor. The Plaintiff's father was

apparently abusive to the family and others in disturbing ways—the Debtor describing him as

being the self-proclaimed leader of his own religious cult and sexually perverted. After the

Plaintiff became famous, there was a period when the Plaintiff and the Debtor had a positive

relationship. After he moved to Las Vegas, he employed her for over four years and gave her

various types of financial support, including free use of a residence in Las Vegas. At some point—

---

[1] *Wellness Intern. Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1949 (2015).

[2] Fed. R. Civ. P. 56(a); *Piazza's Seafood World, LLC v. Odom*, 448 F.3d 744, 752 (5th Cir. 2006); *Lockett v. Wal-Mart Stores, Inc.*, 337 F. Supp. 2d 887, 891 (E.D. Tex. 2004).

[3] *Piazza's Seafood World, LLC*, 448 F.3d at 752 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[4] *Wyatt v. Hunt Plywood Co., Inc.*, 297 F.3d 405, 409 (5th Cir. 2002), *cert. denied*, 537 U.S. 1188 (2003).

[5] *Piazza's Seafood World, LLC*, 448 F.3d at 752; *Lockett*, 337 F. Supp. 2d at 891 & *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

apparently around the year 2015—their relationship deteriorated, and the Plaintiff terminated the Debtor's employment arrangement and ceased providing any financial assistance to her. According to Plaintiff, the Debtor began surreptitiously recording telephone conversations (Debtor admits to doing this twice); perhaps had "bugged" his bedroom at his Las Vegas home (the Debtor does not admit to this; she only admits to bugging their family home in Texas many decades ago); and then began sending the Plaintiff lengthy written communications threatening to reveal unpleasant things about the Plaintiff's private life and their strained family history (five such written communications were submitted as summary judgment evidence and were not disputed).[6]

Sadly, during all of this, the Plaintiff's sister (the Debtor's daughter) died while staying at the Plaintiff's Las Vegas home. Soon thereafter, the Debtor began insinuating that the death was suspicious, and that the Plaintiff may have had some role in it. She sent a letter stating that she had shared her views on this with "numerous relatives and friends, including Texas Rangers and FBI agent friends," and sought a "one-on-one" meeting with the Plaintiff that had "to take place in Texas" and stating that "There will be no cell phones or recording devices of any kind. We will both be searched before entering the room."[7] The Debtor's letter that stated these things was personally handed to the Plaintiff by a courier following an evening performance at The Mirage, when Plaintiff was surrounded by fans, with the courier stating, "you've been served."

Shortly after that, it appears that Plaintiff had had enough, and interpreted this all to be extortionate conduct, *i.e.,* attempts to publicly embarrass the Plaintiff and injure his reputation unless he paid her money. Eventually, the Plaintiff sued the Debtor in a Las Vegas state court (Case No. A-16-743186-B, Clark County, Nevada) seeking: (a) injunctive relief barring her from

---

[6] Plaintiff's Exhibit E [DE # 25], at pp. 84-88, 92-96, and 97-98; Debtor's Exhibit 38 [DE # 45] at pp. 98-107 and Debtor's Exhibit 42 [DE # 45] at pp. 66-68.
[7] Plaintiff's Exhibit E [DE # 25] at p. 95.

any contact with him as well as (b) monetary damages for invasion of privacy, false light invasion of privacy, and defamation, "in an amount greater than $10,000 but not exceeding $50,000," to compensate him for the injuries he allegedly sustained "as a result of [the Debtor's] actions and deter future malicious and unlawful conduct," which Plaintiff stated he would "donate to a charitable organization located in the State of Nevada."[8]  The Plaintiff specifically alleged "actual malice," and an intent to "intimidate" and "instill fear that if he did not accede to her extortionate demands he would suffer harm to his good standing and reputation resulting in substantial economic loss in his professional and business endeavors."[9]

In connection with the Nevada state court lawsuit, the Plaintiff submitted a sworn declaration[10] and also gave live testimony.  In his testimony, he described humiliation at being served with a letter in front of fans at the Mirage, and anxiety for which he needed and received therapy.[11]  Based on the unrefuted evidence, the Nevada State Court issued a $51,603.90 Default Judgment in favor of the Plaintiff ($50,000 of damages plus court costs) on February 6, 2017.[12] The Judgment also enjoined the Debtor from having any contact with the Plaintiff.  There is no evidence that the Debtor ever appealed or moved to set aside the Nevada Judgment and her deadline would have long-since passed.

It is undisputed that the Debtor received service of the Nevada state court complaint, through her then-attorney Kelly Dawson, who acknowledged service on October 6, 2016.[13]  Her attorney sent the Plaintiff's attorney a draft Answer and Counterclaim that he said they intended to file which, among other things, stated an intent to seek $1,000,000 of damages from the

---

[8] Plaintiff's Exhibit A [DE # 25] at pp. 2-3.
[9] *Id*. at p. 13.
[10] Plaintiff's Exhibit B [DE # 25].
[11] Plaintiff's Exhibit C [DE # 25] at pp. 42-43.
[12] Plaintiff's Exhibit D [DE # 25].
[13] Plaintiff's Exhibit B [DE # 25] at p. 20.

Plaintiff.[14]   It is undisputed that Debtor's counsel never filed the draft Answer and Counterclaim but, instead, represented that they had filed a Notice of Removal, in an attempt to remove/transfer the action to the federal district court for the Eastern District of Texas.[15]  The Debtor's counsel did not file such a removal.  But the Debtor did eventually, in April 2019, file a new action, pro se, in the federal district court for the Eastern District of Texas ("Texas Action").[16]

The Texas Action, in a 35-page complaint with 73 attachments, stated facts and allegations going back to the year 1994, but, in summary, asserted that the Plaintiff had used "his wealth and the legal system to defame, bully, torment, harass and intimidate [the Debtor] to obstruct and prevent his Mother from investigating the death of her daughter . . . and for refusing to work with his Mother to resolve their problems privately thereby causing his elderly Mother extreme fear, humiliation, anxiety, embarrassment and financial difficulty.[17]  The Texas Action also claimed that her previous attorney Kelly Dawson did not provide her notice of the Nevada Default Judgment—betraying her by not informing her of court hearings or court dates—and she did not find out about it until July 1, 2017 (approximately five months after the fact).[18]  The Texas Action (again, filed pro se) did not enumerate specific counts but was entitled "Documented Intentional Infliction of Emotional Distress, Breach of Promise, Elder Abuse, Harassment, Bullying, Defamation and Slander."[19]  The "Prayer for Relief," among other things asks for "complete and total termination of the parental Mother and Son relationship"; $1.4 million of compensatory damages which she will reduce to $975,000 if Plaintiff "agrees to issue a public apology" to her; and funding for 24-hour protection for the Debtor for the rest of her life.[20]  The Texas Action was

---

[14] *Id*. at 21.
[15] *Id*.
[16] Plaintiff's Exhibit E [DE # 25].
[17] *Id*.
[18] *Id*. at pp. 62-64, 80.
[19] Plaintiff's Exhibit E [DE # 25] at p. 49.
[20] *Id*. at p. 82.

ultimately dismissed pursuant to the Plaintiff's Rule 12(b) motion, for lack of personal jurisdiction and failure to state a claim. The magistrate's report and recommendation—which was very detailed and thorough, at 19 pages—certainly reflects that the magistrate gave the Debtor her fair day in court.[21] It stated that the Texas Action was an attempt to "air the family's dirty laundry in public" (using the Debtor's own words).[22] It was adopted by the District Judge.[23]

The summary judgment evidence is replete with items that suggest that much of what has gone on here is, indeed, an airing of "the family's dirty laundry in public." One disturbing item suggestive of this is a letter put in the summary judgment evidence, which was from the Debtor's attorney Kelly Dawson to the Debtor (the Debtor waived attorney-client privilege), dated March 3, 2017 (just one month after the Nevada Default Judgment) that showed something like a "to do" list. One item was "You will be contacting Dr. Phil early next week" and another item mentioned that the Debtor also had contact information for "Robbin Leach."[24]

The most relevant material summary judgment evidence was as follows:

A March 26, 2015 letter from the Debtor's attorney Alvin Badger, to the Plaintiff directly, stating that he had been retained by the Debtor "to assist and advise her with regard to the strained relationship, which currently exists between the two of you."[25] Among other things, it stated: "Your financial achievements have rewarded you with the ability to do almost anything money can buy, and given you the opportunity to share your success with those close to you."[26] The letter went on to state that if he could not "forge an agreed resolution of all issues" between the Plaintiff and Debtor, he was "confident that an aggressive Nevada attorney will be able to frame causes of

---

[21] Plaintiff's Exhibit F [DE # 25].
[22] *Id.* at p. 99-100.
[23] *Id.* at p. 118.
[24] Plaintiff's Exhibit G [DE # 25] at p. 135.
[25] Plaintiff's Exhibit E [DE #25] at p. 97.
[26] Plaintiff's Exhibit E [DE #25] at p. 97.

action such as intentional infliction of emotional distress, elder abuse, breach of contract, detrimental reliance, and whatever else that Nevada jurisprudence may offer."[27]

An April 3, 2015 five-page typed letter from the Debtor to Plaintiff discussing their family controversies, and ending with the final paragraph: "If you want to keep this quiet for the sake of your image, I am willing to do that. As far as the public will know, our relationship is good. . . . our attorneys will work out the details."[28]

A May 8, 2015 nine-page typed letter from the Debtor to the Plaintiff, containing a litany of accusations against Plaintiff, ranging from emotional abuse of the Debtor and other family members, to his acts more than 20 years earlier in a religious cult with his father, to suspicions that he had a role in causing his sister's death, and further stating:

> Even though exposing you will greatly benefit me in restoring my reputation that has been damaged by the things you have said about me and done to me, I still respect you enough to let you make the final decision as to how we will proceed. . . . We can handle it in a civil manner and simply agree to disagree on who is wrong and who is right or we can let the public make the decision for us.[29]

Another undated five-page typed letter from the Debtor to the Plaintiff, stating "I am giving you the opportunity to meet with me one-on-one—in private—and discuss the serious problem that is now before us."[30] The letter also stated:

> I am giving you the opportunity for the two of us to sit down alone—without anyone else in the room, and discuss the seriousness of these problems before everything becomes public record. Refusing to cooperate with me is only going to make it more difficult for you. It's your choice but don't get upset when your house of cards comes tumbling down around you. If you agree to meet with me, the meeting has to take place in Texas at a place we both agree on. . . . No one will be in the room except you and I. There will be no cell phones or recording devices of any kind. We will both be searched before entering the room.[31]

---

[27] *Id*. at p. 98.
[28] Plaintiff's Exhibit E [DE # 25] at p. 88.
[29] Debtor's Exhibit 38 [DE # 45] at p. 102.
[30] Plaintiff's Exhibit E [DE # 25] at p. 92.
[31] Plaintiff's Exhibit E [DE # 25] at p. 95.

The letter continues:

> You do need to know that [your sister's] friends and family are refusing to allow her death and the other things you have done to be swept under the rug. … If you choose not to meet with me, I will take your silence as consent to immediately proceed with holding you publicly accountable for all the pain you have brought to our family. … I will expect to hear from you no later than 5:00 p.m. Tuesday August 23, 2016. The meeting will take place within two weeks of that date."[32]

The letter went on to indicate if his attorneys got involved, she would proceed with filing a "wrongful death civil suit" against him regarding the death of his sister.[33]

A June 1, 2015 letter from an attorney named Jordan Peel making large monetary settlement proposals.[34]

The Nevada Default Judgment.[35]

The complaint, the magistrate's report and recommendation, and the District Judge Dismissal Order in the Texas Action.[36]

Although the Debtor is now pro se in this adversary proceeding, and has been pro se from time to time, the summary judgment record shows that she has at various times had three lawyers representing her in connection with her disputes with her son: Alvin Badger of Dallas; Kelly Dawson of Austin; and Jordan Peele of Nevada.[37]

## V.   LEGAL ANALYSIS

Section 523(a)(6) provides, in relevant part, that: "(a) A discharge under section 727 … of this title does not discharge an individual debtor from any debt— … (6) for willful and malicious injury by the debtor to another entity or to the property of another entity." "In other words, debts

---

[32] *Id.* at p. 96.
[33] *Id.*
[34] Debtor's Exhibit 42 [DE # 45] at pp. 66-68.
[35] Plaintiff's Exhibit D [DE # 25] at pp. 47-48.
[36] Plaintiff's Exhibits E and F [DE # 25] at pp. 49-118.
[37] Plaintiff's Exhibit E [DE # 25] at pp. 60, 64, and 97.

for 'willful and malicious injury' are not dischargeable in a Chapter 7 [bankruptcy] case."[38] Courts

in the Fifth Circuit have employed a two-part test to determine willful and malicious injury: an

injury is willful and malicious if the plaintiff demonstrates either (1) "an objective substantial

certainty of harm"; or (2) "a subjective motive to cause harm."[39]

An objective substantial certainty of harm is established where "the defendant's actions,

which from a reasonable person's standpoint were substantially certain to result in harm, are such

that the court ought to infer that the debtor's subjective intent was to inflict a willful and malicious

injury on the plaintiff."[40] "Courts find a subjective motive to cause harm when a defendant acts

deliberately and intentionally, in knowing disregard of the rights of another."[41]

"The 'objective substantial certainty' prong is a recognition of the evidentiary reality that

defendants rarely admit malicious intent."[42] "Because debtors generally deny that they had a

subjective motive to cause harm, most cases that hold debts to be non-dischargeable do so by

determining whether the debtor's actions were at least substantially certain to result in injury."[43]

As such, "[b]ecause a debtor will rarely, if ever, testify to acting in a willful and malicious manner,

a number of cases have held that both elements may be inferred from the circumstances

surrounding the injury. In each of those cases (where a court has held that intent to cause willful

and malicious injury can be inferred), the act was proven, and the intent was inferred by virtue of

the egregiousness of the act."[44]

---

[38] *In re Saaid,* 2020 Bankr. LEXIS 28, at *22 (Bankr. W.D. Tex. 2020) (citing *Kawaauhau v. Geiger*, 523 U.S. 57 (1998)).
[39] *Williams v. Int'l Bhd. of Elec. Workers Local 520 (In re Williams)*, 337 F.3d 504, 509 (5th Cir. 2003) (citing *In re Miller*, 156 F.3d 598, 603 (5th Cir. 1998).
[40] *In re Powers*, 421 B.R. 326, 335 (Bankr. W.D. Tex. 2009).
[41] *Saaid*, 2020 Bankr. LEXIS 28, at *23; *Miller*, 156 F.3d at 605-06 (adopting the definition of "implied malice" from *In re Nance*, 556 F.2d 602, 611 (1st Cir. 1977)).
[42] *Swift Fin., LLC v. Opoku (In re Opoku)*, 2020 Bankr. LEXIS 3376, at *45 (Bankr. E.D. Tex. 2020).
[43] *Berry v. Vollbracht (In re Vollbracht)*, 276 F. App'x 360, 361-62 (5th Cir. 2007).
[44] *Bean v. McMullen (In re McMullen)*, 2004 Bankr. LEXIS 2558, at *31-32 (Bankr. N.D. Tex. 2004) (collecting cases).

As courts in both the Fifth Circuit and other jurisdictions have determined, while intent perhaps may not be inferred from all conduct that may satisfy some elements of a tort claim (*e.g.,* a physical alternation that results in injury), some torts, such as those sounding in invasions of privacy, defamation by imputations of criminality or false statements that may affect the victim's livelihood, extortion and abuse of process—similar to what we have in the case at bar—are of such a nature and so egregious that both injury and intent may properly be inferred for purposes of section 523(a)(6), as those acts are substantially certain to cause harm.[45] Consistent with the foregoing authority, courts may infer a debtor's malicious intent on the basis of circumstantial evidence.[46] Instructively in the present context, the existence or not of a willful and malicious injury is appropriate for resolution on a motion for summary judgment.[47] The creditor seeking to establish a § 523(a)(6) violation need only prove that claim by a preponderance of the evidence, *i.e.,* that it is more likely than not that it occurred.[48]

The court concludes that, based on the unrefuted material facts—the Debtor's own admissions in her pleadings, the Debtor's own statements during the summary judgment hearing, the factual determinations underlying the Nevada Judgment and the various letters she sent directly or through attorneys—the Plaintiff is entitled to summary judgment as a matter of law. There is no need to have a trial. The summary judgment evidence shows that the Plaintiff has a nondischargeable debt, pursuant to section 523(a)(6).

---

[45] *See, e.g., In re Kosobud,* 2009 LEXIS 2221 at *15-*16 (Bankr. S.D. Tex. 2009) (invasions of privacy are "per se willful and malicious"); *In re Scarborough,* 516 B.R. 897, 910-911 (Bankr. W.D. Tex. 2014) (defamation per se constitutes willful and malicious injury); *In re Kahn,* 533 B.R. 576, 588 (Bankr. W.D. Tex. 2015) (actions undertaken to cause financial loss are willful and malicious); *In re Keaty,* 397 F.3d 264, 274 (5th Cir. 2005) (abuse of process constitutes willful and malicious injury).

[46] *See, e.g., In re Jackson,* 2018 Bankr. LEXIS 3372, at 7-8 (Bankr. S.D. Tex. 2018) ("the statutory element of maliciousness may also be inferred from circumstantial evidence").

[47] *See., e.g., Kosobud,* 2009 LEXIS 2221, at *16-*17 (holding that the plaintiff's "motion includes sufficient summary judgment evidence to support the § 523(a)(6) claim that the defendant did commit a wilful and malicious injury"); *In re Phillips,* 2017 Bankr. LEXIS 53, at *25 (Bankr. E.D. Tex. 2017) (same).

[48] *See In re Scarborough,* 516 B.R. at 910-911.

First, to be clear, the court is not determining that the Nevada Default Judgment has preclusive effect here. In fact, Nevada state court authority suggests otherwise.[49] This court views it as just one piece of evidence, among the letters and other court filings. Moreover, while the Nevada Default Judgment is premised more than anything on the torts of invasion of privacy and defamation, this court believes that, collectively, the summary judgment establishes extortion as a matter of law. And the court further concludes that the Plaintiff has conclusively demonstrated through the uncontroverted evidence cited above that the Debtor's extortive actions led to willful and malicious injury, as a matter of law.

It is self-evident that the Debtor's numerous communications were attempts to extort financial concessions from Mr. Fator to which she had no lawful entitlement—by means of threats and blackmail. The Debtor both acted in knowing disregard of Mr. Fator's rights (thus satisfying the subjective test for willful and malicious injury) and her conduct was certain to cause injury to Mr. Fator (thus satisfying the objective test). The Plaintiff finally filed the state court lawsuit in Nevada to try to stop it all—resulting in expense and inconvenience, to be sure.

It is well-established under the law of the Fifth Circuit that where a debtor has acted "in a manner substantially certain to cause financial loss and injury to the [creditor], [she] therefore inflicted a willful and malicious injury upon" him.[50] As such, Mr. Fator has established his right to the relief requested herein on the basis of the Debtor's willful and malicious attempts to extort him. Debtor's abuse of the legal process through her filing of the factually baseless and legally meritless Texas Action against Mr. Fator—an obvious continuation of the Debtor's extortionate scheme—constitutes yet a further willful and malicious injury sufficient to satisfy this Circuit's

---

[49] *See Howard v. Sandoval (In re Sandoval)*, 126 Nev. 136 (2010); *but see Am. Expressway Inc. v. Abate*, 453 P.3d 400 (Nev. 2019).

[50] *In re Kahn,* 533 B.R. 576, 588 (Bankr. W.D. Tex. 2015); *In re Gamble-Ledbetter*, 419 B.R. 682, 699 (Bankr. E.D. Tex. 2009) (same).

subjective and objective tests under section 523(a)(6). As discussed above, the Texas District Court dismissed the Debtor's Texas Action with prejudice at the pleadings stage on the basis of its findings that the Texas Complaint did not state a claim against Mr. Fator under any of the purported "theories" advanced in that pleading and that it was in fact interposed by the Debtor solely to "air the family's dirty laundry in public." Therefore, it is readily apparent that the Debtor's frivolous Texas Action, rather than advancing cognizable legal claims in respect of which the Debtor hoped to obtain judicial redress, was instead only the most recent manifestation of the Debtor's ongoing extortionate scheme and was reflective of her well-demonstrated intent to harass Mr. Fator in an unavailing further effort to intimidate and coerce him into paying her an unwarranted monetary "settlement."

Finally, it is well-established under the law of this Circuit that abusing the judicial process in this manner to harass and cause the unnecessary expenditure of funds constitutes willful and malicious injury under both the subjective and objective tests.[51]

## VI.   CONCLUSION

For the reasons set forth above, summary judgment is granted. Plaintiff should submit a written Judgment consistent with this Opinion. All other relief that may have been requested but that is not set forth herein is DENIED.

### ### END OF MEMORANDUM OPINION AND ORDER ###

---

[51] *See In re Keaty*, 397 F.3d 264, 274 (5th Cir. 2005); *see also In re Kahn*, 533 B.R. at 589-590 (holding that filing a lawsuit to "retaliate" or "get even" with the opposing party caused "unnecessary delay or harassment," and such an abuse of the judicial process "can serve as the basis for finding willful and malicious behavior"); *In re Scarborough*, 516 B.R. 897 (W.D. Tex 2014) ("An injury that is recognizable for purposes of willful and malicious fraud is forcing another person to expend unnecessary money and time.").